Good morning Your Honor. This is an American Disabilities Act case and my client alleges that he was denied a position because of his disability and it was put out on summary judgment by the district court primarily because the argument was that the employer didn't know that he had the disability. And so focusing on that issue, the disability is he actually has a stroke or had a stroke which paralyzed him and part of his body but the disability was that he had to use a wheelchair to get around. And the way the process worked in this case, when you apply for a job, you would go down for essentially a preliminary screening process where you would go into a room and fill out on a computer your application. And then at the end of that process, you would be taken into a back room where you sit down with a person who goes through the questions with you. And then after you're done, has you sign your application electronically. And then when you leave, that person then rates you on a five-element scale, one to five or zero to five. Anyway, they rate you on a scale for five different areas. What happened in this case was my client came in, filled out his application on the computer, and then when he went to go to the back room, he couldn't fit through the door. The wheelchair wouldn't fit through the door. And there became a minor ruckus in this room because he complained that, you know, how can you call yourself an employment application place because you can't even get through the door? To accommodate him, the person from the back came out, sat down with him, interviewed him in the public waiting room, and then had him handwrite his name. And then went back into the back room where she filled out, she completed the application. It's the thrust of your argument that notwithstanding the deposition testimony by the person who actually decided not to select him for a follow-up interview, these facts are sufficient to permit a jury to make an inference that the decision-maker must have known about your client's disability at the time the selection decision was made. It's two parts. First, the judge, we're trying to prove this under the McDonnell Douglas circumstantial evidence, so you had to prove a prima facie case. The judge said we didn't get to the first base on that because we couldn't. Correct me if I'm wrong, but as I understand the record here, you haven't got any admissions by anybody who actually made the selection decision that they actually knew about the disability. Is that true? Yes and no. Well, it's a simple question, counsel. Either the witness said, yes, I knew, or the witness said, no, I don't. Well, from a prima facie standpoint, the hotel had noticed, which is the first element of his disability, obviously because he came in a wheelchair in the interview. When you say the hotel, you're asking us essentially to adopt sort of a corporate entity standpoint that if any employee of the hotel knew, then the hotel itself knew. What authority do you rely on to reach that legal conclusion that the entity is bound by the knowledge of the lowest-level employee who actually interacted with that person? Well, first, it wasn't a low-level employee. This person actually evaluated my client on a scale and gave him ratings, which were then used later on in the process to determine whether to interview him. But she isn't the one who actually made the selection decision. Well, but her input was used to make the selection. So it's not like a clerk who just wrote down the name and then handed it up above. But her rating of him is not that far off from the ratings of other people. It's higher, but it's not that far off. You're right. She rated him higher than others were rated. Right. Well, how does that help your case? Well, because the person who – it shows that the fact is the hotel did put him into the process. He gets to the prima facie part, which is the first four elements. Then the question becomes, why wasn't he selected? If this person who saw him thought that he had these good qualities, then why did the person who ultimately didn't select him – Because they found other people who also had good qualities and decided to hire somebody else. Well, but did they? I mean, if you're going to – my client was never interviewed. There's three people involved in this case. There are two individuals who were selected for an interview, initially offered the job, the first person. The first person didn't make the cut for security reasons. Then they offered the job to the second person, and she made it. My client was never given the interview, and that's the question. And why wouldn't, based upon this initial screening process where my client rated the highest, wouldn't he be given an interview when these other two people were? Was there any element on which the person who saw your client in the wheelchair rated your client, which in any way can give a hint to somebody that your person, your client, is disabled? Well – What are those elements of rating? All right. Well, first off, there are five elements they looked at. Two of them are independently verifiable. There is experience. So the person, the second person who looked at the application, could look at the experience independently by themselves and decide whether the initial rating was correct or not. The second one was job stability. The initial rater rated the person. The second person could, again, look at the application and decide whether job stability was a criteria. The other three elements are all based upon the first person's looking at them. But he passed the first level, did he not? In other words, by virtue of the fact that he scored above whatever it was, a 2 or a 2.5, I can't remember. Right. He got past what I will call the first obstacle. Right. And then another reviewer looked at his scoring in comparison with the scoring of other applicants who had also made it past the first barrier and decided which out of that group they would select for the second level of review, which included interviews. Isn't that how it worked? Essentially, right. They question, they look at what the first person put in, look at the application, then decide whether they want to interview the person. And let me go back to the question I asked you earlier. What evidence do you have that the person who made that second barrier review knew of the disability of your client? Well, just looking at the application itself, there is evidence on the application where he was rated lower. According to the initial screener, she rated him lower because of what happened when he couldn't get through the door. Her testimony, as I understand it, was I didn't rate him lower because he was in a wheelchair. I rated him lower because his irate response struck me as inappropriate or something like that. Right. That's what she said. He said, I said, you know, how come I can't get through the door? I mean, this is a person in a wheelchair who's trying to get a job, and the door won't even let him fit back to the place. The second thing is that she was rated lower on presentation, which, again, is a visual thing which is based upon how she judged him. So she judged him on... Was that because he wasn't wearing a shirt and a tie? No, that was his appearance. Presentation was the one that was lower because of that. Now, the other thing is on the application itself, because he couldn't sign it, and these are signed electronically, she wrote in the following words, due to unusual circumstances, applicant was not able to sign original application. What does that mean? I mean, why wouldn't you? She's in charge of screening this for the hotel. Why would you say due to unusual circumstances? Why not just say the man had a wheelchair and he couldn't get there? That's setting up a red flag. I apologize, Your Honor, I'd like to save a couple minutes. All right. Okay. You're certainly welcome to do that. Very well. Then I guess we'll hear from Mr. Abbott. Thank you. Good morning, Your Honors. As my colleague stated, this is an Americans with Disabilities Act case. As the evidence shows in the record, Mr. Donilon, the plaintiff in this matter, was treated fairly, which is what the ADA compels the treatment of disabled individuals to be. They're not entitled to superior treatment. They're entitled to equal treatment. And that equal treatment was used. Mr. Abbott, may I please interrupt you for just a second? Let's get the cast of characters straight here. Certainly. The first person who interviewed the plaintiff was Ms. Jones. Ms. Jones. That's correct. Ms. Jones saw that the plaintiff was in a wheelchair. That is correct. She told her supervisor, Knapper. Correct. Because, quote, I figured my boss should know. Right? In other words, that there's something unusual about this applicant that the business should know. That is, her boss should know. Now, Knapper testified that she never told Bell, who was the real decision maker in this case. That's correct. Why shouldn't we apply traditional concepts of imputed knowledge and agency to say that Jones and Knapper's knowledge is imputed to Bell because it is the type of knowledge which a business wants to know about and, therefore, in law is deemed to know? And I appreciate the point. My response to that is that under traditional agency principles, you look to the nature of the agency relationship, what the agent is carried out or expected to do in terms of receiving information, and the crux of the agency relationship in terms of imputing knowledge to a corporate entity such as we have here is, is there a duty on behalf of the agent to impart that information to their principal? And I submit to you respectfully that there was no such duty on the part of either Ms. Jones or Ms. Knapper in terms of this particular applicant. What do you do with the fact that Ms. Jones said, I figured my boss should know? She had some, isn't that circumstantial evidence of the existence of a duty that all members of the employer have to their supervisors to tell them if an applicant is indeed disabled? I don't believe that it rises to the level of a duty. I think that based upon reasonable persons find that such a duty exists from the circumstantial evidence adduced. You could certainly argue that point. And if you can, then summary judgment shouldn't be granted. Well, but the point here is that there, again, there is no duty independently given the nature of her employment relationship at this point. I believe that Ms. Jones' testimony was that she, out of the better part of caution, informed her supervisor just gratuitously because she figured she might want to know about this situation. Did the district court make any findings as to the existence or lack thereof of the duty? No. There was no discussion of that at the district court level because the district court concluded in its order granting summary judgment that all that the plaintiff was advancing in terms of an argument was assumption and speculation that someone must have told someone. In fact, the plaintiff never argued below that there was any duty incumbent upon either Ms. Jones or Ms. Knepper to bring that information forward to Ms. Bell. So your position is that the plaintiff did not below in the district court raise the theory of imputed knowledge? That's correct, Your Honor. And basically what we have here was speculation throughout the entire gamut of this case advanced by the plaintiff that someone must have known about this, that this incident where Mr. Donilon became irate in front of Ms. Jones as the employment screener, that this conduct was so notorious that it must have been known throughout the company, especially throughout the Human Resources Department. There's no showing of any evidence to that extent. If I could respond to the point that Mr. Sagerblum made a moment ago, on the rating sheet, Ms. Jones rated Mr. Donilon in such a fashion where she did not downgrade him because of his disability. That was not a factor in it. His behavior was when he was irate and expressed some concern in terms of an outburst, but even with that, she passed him through to the next level, and there's no indication objectively or in the record that the decision-maker, Ms. Bell, was on notice of Mr. Donilon's disability. The undisputed evidence here is that Ms. Bell never met Mr. Donilon. She never had any discussions with either Ms. Jones or Ms. Knepper or anyone else regarding Mr. Donilon. She reviewed his application independently, and she chose not to interview him. That alone indicates that there is no discriminatory taint here given by Ms. Jones's initial rating of the plaintiff. And the argument that's been advanced below and also here this morning, that the comment that Ms. Jones made, which is rather cryptic, I would submit, that due to unusual circumstances he was unable to sign the electronic signature pad, that, the plaintiff argues, is capable of only one interpretation. And I disagree with that, and we disagreed with that below because the fact is it's susceptible to multiple interpretations, including a malfunction of the computer equipment. There is no red flag, as Mr. Donilon would suggest to this Court, that that language was somehow a code for the fact that Mr. Donilon was in a wheelchair and was understood as such by the decision-maker, Ms. Bell. Mr. Abbott, let me ask you a practical question. As I understand it, Mr. Donilon unfortunately passed away during the pendency of the appeal. That's correct. What impact, if any, does that have on the continuing viability of this case? Well, the my understanding is that a relative of his, I believe it's his sister, has substituted into the case in his stead at this point, and that if this case were to be remanded, that it would be pursued at trial on behalf of the family at this point. Of course, from a practical standpoint, the plaintiff's no longer with us. We did take a deposition of him, and I presume that at a trial, his deposition would be what the plaintiff relies upon. So I take it the employer's position is that it doesn't moot the case, although I suspect it would probably moot injunctive relief at least. Yes, that would be our position. It would moot the injunctive portion of the relief to the extent that there was a claim here to hire him into the position. Obviously, that would be mooted. But the estate could still collect damages if the jury found that there was an ADA. That's correct. I haven't done specific research, but that is my understanding. All right. But the damages would be limited to lost wages, not because emotional distress and punitive damages would not survive? Well, there were claims for emotional distress during the remainder of his life. Would he survive under Title VII? I don't know the answer to that question. Mr. Segrebloom stated a moment ago, and I want to respond to this very briefly, about the prima facie case element here. The district court did conclude that Mr. Donilon did not establish a prima facie case in the absence of knowledge by the decisionmaker. There's been argument by Mr. Segrebloom below that a prima facie case was made out, and the case authority in this arena, albeit limited, does, in fact, talk about the fact that the cornerstone of an ADA disability discrimination case is that you have to show that the employer who took the adverse action had knowledge. It's a logical precondition to any possible finding of discriminatory motive or intent. We don't have that here. There's no evidence in the record to suggest the decisionmaker was on notice, either actual or constructive. There is, as mentioned earlier, I don't believe there's a basis to impute knowledge here. That's never been a theory that has been suggested or advanced below, and I don't believe that it should be advanced here. And if I could just comment briefly on the imputed knowledge aspect with respect to this court's decision in the Kimbrough case back in the late 80s, that case is very distinguishable from this case, because there you were dealing with an immediate supervisor and a long-term, I believe it was ten years, as an incumbent employee. And what the court, what this court found in that case was that there was a basis viably to impute knowledge, because the supervisor knew of his employee's discipline under attendance standards for that employee. There was evidence in the record that the supervisor was an integral part of any discipline or discharge decision for feedback purposes. And this court found that there was a duty on Mr. Kimbrough's supervisor's part to carry that information forward to the company as the employer, because he was necessarily a conduit of receiving and reacting to that information. And the defendant's personnel policies were introduced in evidence and required that the employees raise all personnel-related matters with the supervisor. That's exactly right. Here there's no evidence. There's no evidence. Except for the statement by Ms. Jones, I figured my boss should know. And again, respectfully, Your Honor, I would suggest that that's a gratuitous comment by Ms. Jones. I don't think that it gives rise to any duty on her part. Thank you very much. Thank you, Mr. Abbott. Mr. Sagerblum, you have a couple minutes for rebuttal. Thank you, Your Honor. Just quickly on that point, the case below, the judge decided this Hedberg case for the proposition that if the person that made the decision didn't know, you can't prevail. In that case, they even said the plaintiff didn't have an obvious disability, and if it were a case where the plaintiff used a wheelchair, the employer obviously would know. I mean, this is a case where it's crying out to say that at least for the disability, from a variety of reasons. So the question becomes, do we get to the pretext stage? And, you know, we laid out in great detail all kinds of inconsistencies with respect to this case. You just said that the employer knew for a variety of reasons. The person who made the decision, Bell, didn't know because she never saw your plaintiff. What's the other variety of reasons by which the employer can be tagged with knowledge? Well, first off, just because she says she didn't know, I think you don't have to assume that you don't have to believe what she says. I mean, these kinds of things happen all the time where they say something and you know. But the burden of proving a triable issue is to her credibility was on you. Well, but it's a prima facie case. It doesn't even have to have substantial evidence. It's not even don't even have to have a preponderance of evidence to prove that. In this case, we have. You have to have some evidence. I mean, you can't just allege and make a mere assertion in your pleading and then say that's good enough. It's not just that there's he goes to the place he there's a ruckus that occurs. The person who does the interview says she tells the supervisor these are not like two buildings across the hall from each other. The application itself, she puts in bold letters due to unusual circumstances, which seems to be a very politic thing for her to say. She could have said the guy was in a wheelchair and he made a real ruckus here. But she doesn't. She says due to unusual circumstances, he didn't sign the form. Well, it wasn't the ruckus. That seems a very politic thing to say. It wasn't the ruckus. The reason he couldn't sign the thing was because he couldn't fit through the door. And in the 88 case, I believe you have an obligation to say, you know, the person has a wheelchair. If you look at the job description, the job description says you have to be able to walk back and forth in the office. You have to go a thousand feet. Sometimes you have to go all around. I mean, there are a lot of things in this job description which someone in a wheelchair would have to be accommodated for. You would think the hotel would want to affirmatively say this person, if you're going to look at this person, you need to look at this person, and they're going to have to be accommodated. None of that is here. She puts unusual circumstances in bold letters and then stands back and says, oh, no one knew what it was. Well, I mean, doesn't the employer at some point have an obligation to at least ask the question? Again, this is not the prima facie case. This isn't the circumstantial. I think we understand your argument. Thank you, Mr. Stegman. Thank you. The case just argued is submitted, and we will now hear argument in John Searage v. The Bar Asked Food Company.
judges: Tallman, Bybee, Bea